**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

LEATHEA MAE THAMES, individually,
and as the Personal Representative of
the Estate of WILLIAM THAMES, deceased,

   Plaintiff,
v.                Case No. 3:03CV586/RV/MD

CITY OF PENSACOLA and PENSACOLA
POLICE DEPARTMENT,

   Defendants.
                 /

## ORDER

   Pending is the defendant City of Pensacola's motion for summary judgment (Doc. 32), as well as its motion to strike a witness' affidavit. (Doc. 43).

   Plaintiff Leathea Mae Thames brings this civil rights action Pursuant to Title 42, United States Codes, Sections 1983 and 1985, and Title 18, United States Code, Section 245, against Defendant City of Pensacola, based on the death of her son, William Thames, which occurred during the execution of a search warrant at Thames' residence. The plaintiff also alleges several state law claims, including Wrongful Death, Assault, Battery, and Negligence. The defendant now moves for summary judgment, contending that plaintiff has failed to establish that the City of Pensacola can be held responsible for Thames' death under the federal civil rights laws. The defendant also moves to strike the affidavit of expert witness Lou Rieter, which was filed in opposition to defendant's summary judgment motion. Unless otherwise noted, the following facts appear to be undisputed.

**I.  Factual Background**

   This case arises from the sudden death of William Thames on March 13, 2002, when officers with the Pensacola Police Department executed a search warrant at

Thames' residence. The warrant was based on information that "within the last ten days" officers had conducted controlled buys through a confidential informant at Thames' residence in Pensacola, Florida. The officers had an intelligence memo from Officer Brian Jones which stated that there was a narcotics operation located at Thames' residence. The memo identified three potential occupants at the residence: Thames; his girlfriend, Kathryn Lynn Bell; and a man living at the residence named Michael. Thames had an active warrant for felony violation of probation. In addition, the memo indicated that Thames was "ill and requires oxygen."

Before the execution of the warrant, the officers involved conducted a briefing to discuss an "Operations Plan" concerning how the police action would be carried out. The memo which stated that Thames was "ill and requires oxygen" was attached to the Operations Plan.[1] Because the officers were aware that Thames apparently utilized a surveillance camera outside his house, they chose to park on a different street and walk around to the front of the residence to avoid being detected by the camera.      Upon approaching the residence, Officer Barracloug and Det. Steve Bauer moved to cover the rear of the residence, while Sgt. McVicker, Det. Brian Miller, Det. Marvin Miller, and Det. Thomas went to the front of the residence to make entry, moving quickly to conceal themselves from the camera. Once on the front porch, Det. Marvin Miller knocked on the door and announced the police officers' presence, and that they had a search warrant. After waiting several seconds, the officers entered into the residence by opening the door with a ram. Officers then went through the house clearing the rooms and announcing their presence and calling for any occupants to get down on the ground.

Several officers testified that they noticed an oxygen tank and supply tubes in

---

[1] There is an inconsistency concerning whether Thames' medical condition was discussed by the officers during the briefing. However, as will be discussed *infra*, this dispute is not relevant to the issue of the City's municipal liability.

the living room, and the oxygen system appeared to have been recently used. Officers also observed Thames running into the bathroom, and found him kneeling down on the bathroom floor when they approached. The officers called for Thames to get up off the floor, but Thames remained in a kneeling position and complained that he could not move because he was ill. The officers apparently believed that Thames was "faking" an illness, and they handcuffed his hands behind his back while he was still on the bathroom floor.[2] After several minutes elapsed, the officers noticed that Thames was having difficulty breathing and that Thames was actually in need of medical help. They called for an ambulance and removed his handcuffs. Once the paramedics arrived on scene, Thames was transported to the hospital. There he was pronounced dead from congestive heart failure. Thames had a history of severe coronary artery disease.

Subsequently, the plaintiff filed this action in her individual capacity and as the representative of William Thames' estate, alleging federal civil rights violations, as well as various state law claims for wrongful death, negligence, assault, and battery.

## II.    Motion to Strike Expert Affidavit

After the defendant filed the pending motion for summary judgment, plaintiff submitted the declaration of Lou Reiter, plaintiff's expert witness, in opposition to defendant's motion for summary judgment. While Lou Reiter had previously been listed as an expert witness in this case, defendant contends that Reiter's affidavit filed on January 11, 2005, is a new declaration, containing new opinions, which are untimely. The procedural background in this case pertaining to the disclosure of

---

[2] Kathryn Lynn Bell, Thames' girlfriend, testified that officers forcibly picked Thames up off of the floor and then forcibly dropped him back down on the floor from about three feet off the ground. The officers contend that this never happened, and they were not even able to lift Thames due to his size. This dispute is not material to the issues raised by the City's summary judgment motion.

expert witnesses is particularly important in resolving the defendant's motion to strike.

Soon after this litigation began, I entered an initial scheduling order directing the parties to meet and then submit a joint scheduling report. In their joint report which followed, the parties agreed to a discovery deadline of September 28, 2004, and agreed that expert witnesses would be disclosed by April 2, 2004. I incorporated the joint report's deadlines in my final scheduling order entered on March 24, 2004. On April 2, 2004, plaintiff submitted an expert disclosure, which simply stated, in relevant part: "Plaintiff's counsel has not yet decided which expert witness to utilize in this matter. Plaintiff's counsel will need to conduct discovery in order to determine which experts if any, to utilize and therefore reserves the right to supplement the Disclosure of Expert Witness on or before July 30, 2004." Plaintiff never moved for an enlargement of time. Thereafter, on July 27, 2004, plaintiff sent defendant her list of expert witnesses, naming for the first time five experts, including Lou Reiter. Plaintiff served her expert witness reports on August 2, 2004.

Defendant objected to plaintiff's untimely disclosure of expert witnesses, citing the April 2, 2004, deadline contained in the final scheduling order. Defendant also argued that the late disclosure prejudiced its case because discovery was almost over at that point, and defendant would not have ample time to review the expert reports and depose the untimely listed experts. On October 5, 2004, the magistrate judge assigned to handle discovery in this case entered an order admonishing plaintiff for unilaterally granting herself a three-months extension, without requesting relief or leave of the court, and required plaintiff's counsel to show cause why he should not be sanctioned for such failure. Nevertheless, the court was hesitant to strike the expert witness disclosure, recognizing that "doing so would be tantamount to dismissing plaintiff's case." Therefore, the magistrate judge allowed the plaintiff's late expert witnesses disclosure, but extended the discovery deadline through November 30, 2004, to allow defendant to depose the expert witnesses.

On December 9, 2004, defendant moved for summary judgment on the issue of governmental liability, contending that plaintiff was unable to prove a custom, policy, or practice of the City of Pensacola which was the moving force behind any constitutional violation.  In defendant's summary judgment motion, defendant noted that the plaintiff's own expert in police practices, Lou Reiter, had no relevant information regarding the issue of governmental liability, as opposed to the potential individual liability of the officers.  In response and in opposition to defendant's motion for summary judgment, plaintiff then submitted the contested affidavit of Lou Reiter, which declared that the City's failure to maintain a written policy regarding the availability of medical treatment for people taken into custody by the police represented a deliberate indifference to the rights of citizens.

Defendant contends that Reiter's declaration submitted in support of plaintiff's response to the summary judgment motion, contains an opinion "very significantly changed or modified" from his earlier opinion and deposition testimony.  Therefore, defendant argues that it should not be admitted at this late stage of the litigation.

Rule 26 of the Federal Rules of Civil Procedure now provides clear deadlines for disclosure of expert opinions.  See Bearint ex rel. Bearint v. Dorell Juvenile Group, Inc., 389 F.3d 1339, 1348 (11th Cir. 2004).  Rule 26 plainly sets out that a party must disclose an expert witness's opinion in a report which must contain, among other things, ". . . a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions . . . ."  Fed. R. Civ. P. 26(a)(2)(B).  Further, a party has an obligation to supplement and amend discovery when an expert from whom a written report is required under subdivision 26(a)(2)(B) changes or modifies an opinion previously expressed:

> (1)  A party is under a duty to supplement at appropriate intervals its disclosures under subdivision (a) if the party learns that in some material respect the information disclosed is incomplete or incorrect and

> if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. <u>With respect to testimony of an expert from whom a report is required under subdivision (a)(2)(B) the duty extends both to information contained in the report and to information provided through a deposition of the expert, and any additions or other changes to this information shall be disclosed by the time the party's disclosures under Rule 26(a)(3) are due. Fed. R. Civ. P. 26(e)(1)</u>. (emphasis added).

Thus, the duty to supplement disclosures applies whenever a party learns that its prior disclosures or responses are in some material respect incomplete or incorrect. In the parties' joint report, the parties agreed that all supplementation of disclosure and responses would be provided "within 20 days after discovery of the need to supplement or 10 days prior to the discovery deadline, whichever is earlier."  In this case, the discovery deadline was extended through November 30, 2004.  However, Reiter's new affidavit was not submitted by plaintiff until January 10, 2005, and then only in opposition to defendant's summary judgment motion.

Therefore, the question is whether Lou Reiter's January 10, 2005, affidavit represents a significant modification or change from his earlier testimony or opinion. In Reiter's prior expert report, submitted on July 22, 2004, Reiter stated that, in his opinion, the officers who raided Thames' house should have taken reasonable precautions to ensure care for Thames' known medical condition, including having a medical support unit staged in the close vicinity of the residence.  In Reiter's opinion, having medical units stage when police are aware that potential violence may occur or known medical needs are present is a common and reasonable police practice. However, Reiter expressed no opinion concerning whether such practice should be left up to the discretion of the officer in charge of the warrant execution or whether it should be contained in a written policy.  Reiter offered no opinion concerning the practices of the Pensacola Police Department itself.

Similarly, in his deposition, Reiter addressed the conduct of the individual police

officers in raiding Thames' residence, but disclaimed any opinion concerning the policies and procedures of the Police Department. Specifically, the following exchange took place:

> Q. (Defendant's attorney):
> Now, has any information been provided to you concerning the customs, policies or practices at the Pensacola Police Department?
> A. (Mr. Reiter): No.
> Q. Has the policy manual been provided to you?
> A. No, it has not.
> Q. Has any information been provided to you concerning whether there have been other events in the past similar to this one that would cause you to conclude what happened on March 20th was a routine practice at the Pensacola Police Department?
> A. No. I have no opinions on the agency issues because I have no information on that.

Thus, Reiter specifically said that he was expressing no opinion concerning the customs, polices, or practices of the Pensacola Police Department. However, in the contested affidavit submitted in opposition to summary judgment, Reiter opines that "it would be contrary to accepted police practices and exhibit a deliberate indifference to the well being of persons taken into police custody, in my opinion, not to have a written policy requiring police employees to provide for emergency medical needs for persons taken into custody." Reiter states that he formed this opinion after recently reviewing the deposition testimony of Chief of Police Mathis, where Chief Mathis stated that the Pensacola Police Department had no specific policy or custom in place to address the specific needs of Thames, and that it would be the discretion of the supervisor of the warrant execution to determine whether to have emergency medical resources deployed on standby. Therefore, it is clear that Reiter is offering a new opinion and changing his position as set out in his expert report or his deposition testimony. Accordingly, if plaintiff determined that she needed to supplement Reiter's

report, after review of additional material, she was bound to do so, under Rule 26 as well as this court's order, by November 20, 2004 - - - ten days before the discovery deadline elapsed.

     Parties who run afoul of Rule 26 disclosure requirements may face sanctions as specified in Rule 37 of the Federal Rules of Civil Procedure.  In relevant part, Rule 37 provides, "A party that <u>without substantial justification</u> fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, <u>permitted to use</u> as evidence at a trial, at a hearing, <u>or on a motion</u>  any witness or information not so disclosed."  Fed. R. Civ. P 37(c)(1) (emphasis added).   Rule 37 gives district courts discretion to exclude untimely submissions.  <u>Bearint ex rel. Bearint</u>, <u>supra</u>, 389 F.3d at 1348-49 (citing <u>Coastal Fuels Inc. v. Caribbean Petroleum Corp.</u>, 79 F.3d 182, 202-03 (1st Cir. 1996)).   This Court's Initial Scheduling Order also directs, "Expert witnesses not timely disclosed as required by Rule 26(a)(2), or whose opinions have been significantly modified or changed after discovery has ended, will normally not be permitted to testify at trial."

     Therefore, in accordance with Rule 37, the plaintiff must offer a "substantial justification" for failing to disclose Reiter's modified opinion by the discovery deadline, unless such failure is harmless, before she will be permitted to use the new testimony as evidence at trial or on any motion.  <u>See</u> Fed. R. Civ. P 37(c)(1).  Plaintiff has offered no justification at all for failing to supplement Reiter's expert report as required by Rule 26.  Instead, plaintiff simply included the new testimony in an affidavit filed in opposition to defendant's motion for summary judgment.  Reiter's modified opinion is thereby disclosed for the first time, well past the already-extended discovery deadline, and without any prior notice to the defendant.

     Despite the fact that plaintiff's complaint includes only the City of Pensacola as a party, and avers that the defendants acted pursuant to a custom or policy, the

plaintiff offers no explanation for Reiter's failure to address, in his deposition or his prior report, the issue of municipal liability or the necessity of a written policy or procedure regarding advance preparations for the emergency medical needs of persons taken into police custody. In his expert report disclosed in July of 2004, Reiter states that he will be reviewing more information as the discovery process moves forward, and he requests that he be allowed to supplement his report upon his review of the additional material. However, this statement does not amount to a motion to extend the disclosure deadlines as mandated by Rule 26 and by this court's scheduling order.

In light of this court's previous order admonishing plaintiff for unilaterally extending the deadline for disclosing expert witnesses, and in light of the already-extended discovery deadline due to plaintiff's discovery violations, I find no substantial justification for plaintiff's failure to adhere to the Rule 26 disclosure requirements. Further, plaintiff's untimely submission of Reiter's modified opinion would cause the defendant prejudice, as the discovery deadline has well passed, and defendant has not had an opportunity to depose Reiter concerning his new and material testimony. Therefore, plaintiff's motion to strike the January 10, 2005, affidavit of Lou Reiter is GRANTED.

**III.   Motion for Summary Judgment**

    A.   Summary Judgment Standard

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v.

Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265, 273 (1986); see also Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir. 1996).

However, summary judgment is improper "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 594 (11th Cir. 1995). An issue of fact is "material" if it might affect the outcome of the case under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202, 211 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. See id.; see also Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538, 552 (1986).

Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact. See Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000); Ramsey v. Leath, 706 F.2d 1166, 1170 (11th Cir. 1983). On a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1313 (11th Cir. 1999).

B. Municipal Liability

Plaintiff initially sued the City of Pensacola, the Pensacola Police Department, and several John Doe defendants, pursuant to Title 42, United States Code, Section 1983, arguing that Thames was deprived of his constitutional right to medical treatment. Plaintiff failed to timely amend the complaint to replace the John Doe defendants with the named officers, and therefore, the individual officers are not parties to this action.[3] With respect to the Pensacola Police Department itself, it is

---

[3] On December 13, 2004, three months after the close of discovery in this case, plaintiff filed a motion to amend her complaint in order to substitute four named Pensacola police officers for the previously named John Does. On December 27,

generally recognized that a police department is not a separate legal entity apart from the municipality. Dean v. Barber, 951 F.2d 1210, 1214 (11th Cir. 1992). Instead, the Pensacola Police Department is an arm of the City of Pensacola which fulfills its policing function. Thus, for purposes of the summary judgment motion now under consideration, the Pensacola Police Department and the City of Pensacola will be considered the same defendant with respect to liability. Accordingly, plaintiff has only named the City of Pensacola as the responsible party for the alleged constitutional deprivation, and the City moves for summary judgment, arguing that the record fails to contain evidence sufficient to establish municipal liability under Section 1983.

In Monell v. New York City Dept. of Social Services, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), the Supreme Court of the United States held that municipalities and local governments may be included among "persons" within the scope of Section 1983. Id. However, the Court reasoned that municipalities may not be held liable unless the municipality *itself* caused the constitutional violation at issue. Id. at 694-695, 98 S. Ct. at 2037-38. In other words, unless the "execution of the government's policy or custom . . . inflicts the injury," the municipality will not be held liable under Section1983. Id. at 694, 98 S. Ct. at 2037-38; Garvie v. City of Ft. Walton Beach, 366 F.3d 1186, 1188 (11th Cir. 2004); Grech v. Clayton County, 335 F.3d 1326, 1329 (11th Cir. 2003).

In establishing the level of culpability necessary to hold a municipality responsible for constitutional deprivations, the Supreme Court of the United States recognized that in nearly every Section 1983 action in which there is an injury, the plaintiff will be able to point to something that a municipality could possibly have done to prevent the unfortunate incident. City of Canton, Ohio v. Harris, 489 U.S. 378, 392 109 S. Ct. 1197, 1206, 103 L. Ed. 2d 412 (1989). However, permitting cases

---

2004, I denied plaintiff's motion to amend as untimely.

to go forward on such a basis "would result in *de facto respondeat superior* liability. " Id. Therefore, "simple or even heightened negligence is not enough." Bd. of County Commisioners of Bryan County, Okl. v. Brown, 520 U.S. 397, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997);  McDowell v. Brown, 392 F.3d 1283 (11th Cir. 2004). Instead,"(m)unicipal liability under §1983 attaches where - - - and only where - - - a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. Pembaur v. Cincinnati, 475 U.S. 469, 483-84, 106 S. Ct. 1292, 1300-1301, 89 L. Ed. 2d 452 (1986); See also City of Canton, Ohio v. Harris, supra, 489 U.S. at 389, 109 S. Ct. at 1205.  Moreover, the city's policy in question must amount to "deliberate indifference to the rights of persons with whom the police come in contact." City of Canton, supra, 489 U.S. at 388, 109 S. Ct. at 1204, and the plaintiff must prove that through the city's deliberate conduct, the municipality was the "moving force" behind the injury alleged. Bd. of County Comm'rs of Bryan County, Olka. v. Brown, supra, 520 U.S. at 404, 117 S. Ct. at 1389.

Based on the above general principles underlying Section 1983, in order to establish municipal liability, a plaintiff must show: "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, supra, 392 F.3d at 1289 (citing City of Canton, Ohio v. Harris, supra, 109 S. Ct. 1197, 489 U.S. 378).

With respect to the first requirement, Plaintiff alleges that the individual officers violated Thames' right under the Due Process Clause of the Fourteenth Amendment by depriving Thames of necessary medical care.  The Due Process Clause of the Fourteenth Amendment provides that "(n)o State shall  . . . deprive any person of life, liberty, or property, without due process of law."  The Supreme Court of the United States has held that the Due Process clause imposes upon state and municipal law enforcement officials a constitutional duty to provide medical care to persons who

have been injured while being apprehended by the police. See City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 244, 103 S. Ct. 2979, 103 L. Ed. 2d 605 (1983)(holding that police officers fulfilled constitutional duty by promptly taking arrestee to a hospital.)

The Eleventh Circuit has applied a "deliberate indifference" standard to claims of improper medical care by law enforcement. See e.g., Thomas v. Town of Davie, 847 F.2d 771 (11th Cir. 1988); Aldridge v. Montgomery, 753 F.2d 970, 972 (11th Cir. 1985)(citing Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)). Moreover, a plaintiff must prove that the law enforcement officer was both "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). Knowledge of the asserted serious medical risk of the pretrial detainee or arrestee, or of circumstances clearly indicating existence of such risk, is essential to finding that officers were deliberately indifferent, as required to support a finding of the Fourteenth Amendment violation. Young v. City of Mount Rainer, 238 F.3d 567, 575-76 (4th Cir. 2001); Horn by Parks v. Madison County Fiscal Court, 22 F.3d 653 (6th Cir. 1994).

The plaintiff argues that, based on these principles, due process required the defendant and the individual police officers to provide medical care to Thames when he became critically ill while being apprehended by them in the execution of the warrant. In addition to a duty to provide medical care to Thames after he was apprehended by police officers, the plaintiff also claims that since the officers had information that Thames was "ill and requires oxygen," the officers had a constitutional duty to be prepared to supply oxygen to Thames or have trained emergency medical technicians close at hand before they entered Thames' residence

to execute the warrant.[4]

The analysis of this case for purposes of the pending summary judgment motion is limited to the City's potential Monell liability. Therefore, even assuming that the plaintiff has set forth facts which establish, or at least create a genuine issue of material fact as to whether, the individual officers deprived Thames of a constitutional right to medical care, the plaintiff must identify the municipal policy or custom which allegedly caused the constitutional injury. Bd. of County Comm'rs of Bryan County, Olka. v. Brown, supra, 520 U.S. at 403, 117 S. Ct. at 1388; Davis v. DeKalb County School Dist., 233 F.3d 1367, 1375 (11th Cir. 2000). Plaintiff does not point to an express or written policy of the City, but contends the City had a policy of allowing supervisors to determine on a discretionary basis whether to take extra precautions, such as having emergency medical staff staged in the area, while police officers execute a warrant at a house where a suspect is known to have a medical problem. Plaintiff contends that instead of leaving the decision up to the discretion of the officer in charge, the City of Pensacola should have had in place a formal policy requiring medical assistance to be "readily available" when an officer executes a warrant and has knowledge that the target of the warrant is "ill and requires oxygen."

Thus, in this case, the plaintiff's claim for municipal liability is predicated upon the City of Pensacola's alleged failure to establish a formal policy. Municipal liability may be imposed due the absence of a policy establishing appropriate procedures to ensure against a violation of a person's constitutional rights. See e.g., Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991)(holding that liability may be imposed due to the existence of an improper policy or from the absence of a policy). In such a case, however, where a plaintiff seeks to establish municipal liability on the municipality's failure to act, the plaintiff must show that the "'policy of inaction' is the

---

[4]Of course, Thames had his own oxygen supply readily available and apparently in good working order.

Case No.: 3:03cv586/RV/MD

functional equivalent of a decision by the city itself to violate the constitution." City of Canton, supra, 489 U.S. at 394-95, 109 S. Ct. at 1208,(J. O'Connor *concurring*). For instance, a plaintiff must establish that the municipality's failure to maintain a policy amounted to deliberate indifference to its known or obvious consequences. Bd. of Comm'rs of Bryan County, supra, 520 U.S. at 407, 117 S. Ct. at 1390; McDowell v. Brown, supra, 392 F.3d at 1291.

The Supreme Court of the United States has warned that "(t)o prevent municipal liability for a ….decision from collapsing into respondeat superior liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged." Bd. of Comm'rs of Bryan County, supra, 520 U.S. at 410, 117 S. Ct. at 1382.  In "testing the link" between the plaintiff's injury and the municipal policy, the Eleventh Circuit looks to whether the evidence reveals that the municipality should have known that the plaintiff's injuries would be a "plainly obvious consequence" of that decision.  McDowell, supra, 392 F.3d at 1292-93; See also, City of Canton, supra, 489 U.S. at 390, 109 S. Ct. at 1209 (holding that municipal liability may be based on a showing that the need for a particular policy is obvious, and the absence of the policy so clearly likely to result in a violation of constitutional rights).

A means of establishing that a city's failure to act constitutes a deliberate choice would be to show a history of widespread abuse of law enforcement discretion in a particular area sufficient to put the policymaker's on notice that a particular policy or additional training is needed to protect the constitutional rights of others. City of Canton, supra, 489 U.S. at 390, 109 S. Ct. at 1209;  Mercado v. City of Orlando, 407 F.3d 1152, (11th Cir. 2005); Rivas v. Freeman, supra, 940 F.2d at 1494.   For example, in Rivas v. Freeman, supra, 940 F.2d at 1495, the Eleventh Circuit found that municipal liability may exist where the Sheriff fails to establish policies and procedures concerning the correct and accurate identification of suspects.  The court reasoned that the Sheriff was responsible for establishing such policies, and he clearly

failed to do so. Id. at 1495. However, in determining whether the plaintiff had sufficiently established municipal liability, the Eleventh Circuit noted that the plaintiff presented evidence which established that the Sheriff "knew of prior instances of mistaken identity, but allowed his deputies to detain individuals even where discrepancies existed." Id.

The claim in this case - - - that the city should have had a written policy requiring police officers to have emergency medical support in the area when they execute a search warrant on a resident where they have information that the resident may be ill - - - falls short of the kind of "obvious" need for a policy that would support a finding of deliberate indifference to constitutional rights on the part of the City of Pensacola. The plaintiff has not presented any testimony or evidence indicating that there have been past incidents of "deliberate indifference" to similar medical needs of pretrial detainees or persons subject to a search warrant. In fact, Chief Mathis testified that he is not aware of any other incident where officers executed a warrant on a target who the officers knew to be ill or to require oxygen. The plaintiff has presented no evidence of incidents similar to the one in this case. Thus, this appears to be a singular, isolated situation. Further, the plaintiff is not arguing, and there is no evidence to establish, that the City of Pensacola maintains a policy or custom of denying medical care to pretrial detainees or arrestees who have been injured while being apprehended by the police.

Moreover, the plaintiff does not argue that the City's "discretion of the supervisor" policy has been abused or is unreasonable. Absent evidence that the City's law enforcement officers have a history of abusing their discretion regarding the medical needs of arrestees, the City's unwritten policy of leaving it up to the discretion of the officer in charge to determine the seriousness of those medical needs, and the best way to provide for the medical needs, does not rise to a level of deliberate indifference. Such a policy appears to be, as a general matter, quite reasonable.

"Medical needs" covers a wide spectrum of conditions. A high percentage of the general population have some type of medical problem and perhaps have been prescribed medication, but which is not serious. Even those taking supplemental oxygen may be doing so for breathing problems that are not ordinarily life threatening. Thus, each medical condition must necessarily be evaluated on an *ad hoc* basis. In this case, whether the likelihood of Thames' heart failure appeared to be "probable", as the plaintiff argues, is not the issue. If Thames' heart failure appeared to be probable to the officers before they entered his residence, then the plaintiff may be able to establish some liability against the individual officers. However, that does not establish that it was known or obvious to the City of Pensacola that its officers would face the situation which presented itself in this case. Absent evidence of such a connection, the plaintiff has failed to present any evidence that the City of Pensacola made a conscious decision to disregard a known consequence. Instead, this case presents an isolated incident in which the individual officers may possibly have been negligent, but there is no evidence in the record to establish that the City of Pensacola has been deliberately indifferent to the constitutional rights of arrestees. Accordingly, the City of Pensacola's motion for summary judgment regarding plaintiff's Section 1983 Monell claim must be GRANTED.

    C.    Plaintiff's Additional Federal Claims

Defendant also moves for summary judgment regarding plaintiff's claim that the City of Pensacola violated Title 42, United States Code, Section 1985, based upon the same facts. Title 42, United States Code, Section 1985, authorizes a plaintiff to bring a cause of action against persons who conspire to interfere with civil rights. 42 U.S.C. §1985(3). However, unlike Section 1983, Section 1985 is confined to a very limited type of conspiracy. Accordingly, the Supreme Court of the United States has explained;

> " . . . in order to prove a private conspiracy in violation of the first clause of §1985(3), a plaintiff must show, inter alia, (1) that 'some

racial, or perhaps otherwise class-based, invidiously discriminatory animus (lay) behind the conspirators' action,' and (2) that the conspiracy 'aimed at interfering with rights' that are 'protected against private, as well as official, encroachment."

Bray v. Alexandria Clinic, 122 L. Ed. 2d 34 (1993); See also Trawinski v. United Techs., 313 F.3d 1295, 1299 (11th Cir. 2002)(holding that Section 1985 requires the plaintiff to allege "invidious discriminatory intent" on the part of the defendants)

The plaintiff concedes that she has not alleged a factual basis for a conspiracy, nor has she alleged or established that the defendant's intent behind the constitutional deprivation was in violation of the Equal Protection Clause of the Fourteenth Amendment, nor due to a race-based motive.  Therefore, the plaintiff also concedes that Section 1985 provides no basis for her claim.

Similar to the Section 1985 claim, plaintiff also concedes that Title 18, United States Codes, Section 245, also does not provide relief for the facts alleged in this case.  Section 245, by its express provisions, only applies to victims who were prevented from exercising a constitutional right because of race, color, religion or national origin.  Moreover, Section 245 creates a criminal penalty, but does not create a private right of action.

Therefore, the City of Pensacola is entitled to summary judgment with respect to plaintiff's claims under Title 42, United States Code, Section 1985, and Title 18, United States Code, Section 245.

      D.    State Law Claims

This order has not addressed the plaintiff's state law claims.  "A court may decline to exercise jurisdiction over state-law claims, where the Court has dismissed all the federal claims over which it has original jurisdiction."  McColloch v. PNC Bank Inc., 298 F.3d 1217, 1227 (11th Cir. 2002)(citing 28 U.S.C. §1367(c)(3)).  The Eleventh Circuit has noted that "if the federal claims are dismissed prior to trial, Gibbs strongly encourages or even requires dismissal of state claims."  L.A. & Son v.

Wheelabrator-Frye, Inc., 735 F.2d 414, 428 (11th Cir. 1984)(citing United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966)); see also Raney v. Allstate Ins. Co.,370 F.3d 1086, 1089 (11th Cir. 2004)(stating that the Eleventh Circuit has "encouraged district courts to dismiss any remaining state law claims when . . . the federal claims have been dismissed prior to trial"); Mergens v. Dreyfoos, 166 F.3d 1114, 1119 (11th Cir. 1999).

Having disposed of the plaintiff's federal claims, I decline to exercise supplemental jurisdiction over the plaintiff's remaining state law wrongful death claim, as well as the state law negligence and intentional tort claims against the Defendant. Accordingly, the plaintiff's state law claims contained in Counts VI, VII, VIII, and IX will be dismissed, without prejudice, to allow the plaintiff to pursue those, if she chooses to do so, in state court.

### III.    CONCLUSION

For the foregoing reasons, the City of Pensacola's motion to strike the affidavit of Lou Reiter (doc. 43) is GRANTED.  Defendant City of Pensacola's Motion for Summary Judgment is also GRANTED with respect to all of plaintiff's federal claims against the City of Pensacola, the only defendant. The plaintiff's state law wrongful death, negligence, battery, and assault claims are DISMISSED, without prejudice. The Clerk is directed to enter judgment accordingly, and to close this case.

DONE and ORDERED this 1st day of August, 2005.

*/s/ Roger Vinson*
**ROGER VINSON**
**Senior United States District Judge**